## J. WILLIAMS ALIAS DOC. WILLIAMS v. THE STATE.

### No. 3928. Decided June 10, 1908.

**1.—Murder—Charge of Court—Alibi.**

Where upon trial for murder the court correctly charged on the law of alibi, there was no error in refusing a special charge on the same subject; besides the latter was not in correct form and was too restrictive.

**2.—Same—Sufficiency of the Evidence.**

Where upon trial for murder, inflicting the death penalty, there was nothing in defendant's motion to show wherein the judgment of conviction was contrary to the evidence; and the same, though circumstantial, leaves no room for doubt that the defendant is guilty, there was no error.

Appeal from the District Court of Bexar. Tried below before the Hon. Edward Dwyer.

Appeal from a conviction of murder in the first degree; penalty, death.

The opinion states the case.

No brief on file for appellant.

*F. J. McCord,* Assistant Attorney-General, for the State.

RAMSEY, JUDGE.—Thos. J. Turner, a white man, who lived in Corinth County, Kentucky, came to San Antonio with his wife and baby, arriving there directly from Cincinnati, Ohio, on April 16, 1908. They came to San Antonio for Mrs. Turner's health. Immediately on their arrival the husband sought work but was unable to find any employment. As early as Tuesday morning, April 22nd he became acquainted with appellant and the two arranged to go, and on that day went, into the country selling oranges and undertaking to buy chickens and eggs. They traveled in a light one horse express wagon. On Thursday following the appellant returned to San Antonio alone, and on inquiry as to how he and deceased had come out in their trading expedition, in terms, stated that he had not gone further east than Commerce street in San Antonio, when Turner met a man with a horse and wagon which he liked better than his (appellant's) and that Turner thereupon paid him a dollar for his trouble up to that time and he then came back and did not go with Turner. The body of Turner was found on the following Saturday morning near the roadside about six

miles from Lavernia on the San Antonio and Lavernia road and about eighteen miles from the first-named place, by one Theodore Ramzinsky. He was passing along the road and saw a dog eating at something like a bone, where, on the Thursday morning previous, he had seen appellant at a fire. His team became frightened and he stopped to investigate the matter and found the remains of a man. He at once gave the alarm and in a short time the local constable with other parties came to the place of the gruesome find. When Curry, the constable, arrived at the scene of the murder, he could see about half the right foot and leg projecting from the ashes and earth. The man's face, nose and chin were burned, his breast was burned out and his liver could be seen, baked hard. He was lying on a yellow slicker and had an old grass sack under his head. Evidences were observed of tracks near the body as though some one had been carrying wood from a tree near the road, and of where some one had been raking dirt together to put on the body. There were also tracks of a one-horse wagon. There was also found near the body some egg shells, a knife and some wrappers off of oranges. There was one wound made apparently by a sharp instrument, such as a hatchet or axe, extending from an angle of the eye down about six inches on the right side, and a fracture of both the upper and lower jaw bone. There was another wound also, made apparently by a similar sharp instrument, on the left side of the head and just back of the left ear, extending about four inches, fracturing the skull and extending down into the brain substance itself. The physician, who examined the remains, found just at the top of the head an old wound, evidently as he states, a fracture of long standing, made years ago. The wound back of the ear was undoubtedly the cause of the man's death. On the same day the remains, in a practically unchanged condition, were brought to San Antonio. The remains of this man were seen soon after their removal to San Antonio at Riebe's undertaking establishment, by the wife of deceased and were positively identified by her as those of her husband, Thos. J. Turner. This identification was based on the scar or fracture on top of his head and by his shoes and socks. The scar or fracture referred to was in all respects identical as to size and location with that described by the other witnesses who first examined the body. Among other things Mrs. Turner, in her testimony, says: "They were my husband's remains positively and he was dead. As to the burnt parts, I could see there were some. I could see the top of his head and the hair, and I recognized him by that and the scar; but they would not allow me to see any more of the body. I also recognized the shoes and socks and identified them. Yes, I identified these shoes as being those of my husband, and they were his shoes and I could identify the socks by the figure in them. They were the same shoes and socks he wore on his feet on Tuesday when he left home." In view of this testimony, we think there can be no doubt as to either the certainty or sufficiency of the identification of the remains found as those of Thos. J. Turner and that, therefore, the corpus delicti is firmly and well established. Appellant

and Turner were shown to have been together in this express wagon at different places by many people on Tuesday, Wednesday and Thursday of the week in question and in the neighborhood of where the body of deceased was found. This circumstance was so clearly and fully shown by the testimony of so many witnesses that it cannot be doubted. As stated above, the appellant was shown to be at the very spot where the remains of the dead man were found on Thursday morning. On this point the witness Ramzinsky testified that on Thursday he left his house, some half-mile away, on horseback, and was leading a small dog, and that it was about good daylight when he saw appellant standing alongside of a fire about three feet high on the road. That he also saw a brown horse hitched up to an express wagon and that there were a few chickens in the coops in the wagon. That this negro said to him, "Good morning, you are leading the poor boy," referring to the dog, and I said "Yes." He says that this fire had been made in a ditch, near or in the road and was three feet high, three or four feet wide and about the same length. That he came back by the same place in about two hours and saw no one, and in fact paid no attention to the fire and did not discover the remains of the man in question until the following Saturday. Mrs. Turner testified that on Tuesday morning appellant came with her husband to their house in the wagon referred to, and that her husband came into the house and she gave him $50 "Currency money of the United States," and that as he went out he said: "Go back and get the pistol, we might need it," and that she went back into the house, got the pistol and took it to him. That he was at the time on the porch and that he talked to the baby, kissed her, got on the wagon and drove away and that was the last time she ever saw him alive. When arrested the appellant was wearing Turner's hat. It was a round, black, soft hat, and was particularly identified by Mrs. Turner for the reason and from the fact that inside the sweatband of same were folds of a Cincinnati newspaper, had a Cincinnati mark on it and the paper contained advertisements of Cincinnati business houses in it. She positively identified the hat worn by appellant as the same hat which her husband had on his head when he left home the Tuesday morning before. It was shown, and indeed in express terms admitted, that appellant had on Friday or Saturday after the murder pawned a watch belonging to the deceased. This watch was an open-faced gold watch with the picture of an engine engraved on the back of it. Thos. J. Turner had this watch on his person and was wearing same in the usual way when he left home in company with appellant on the Tuesday morning before his death. The pistol of deceased was traced to the possession of appellant subsequent to the murder. This pistol was an Army Colts with a wooden handle and had a screw off at one place. Its identification by Mrs. Turner was positive and complete. When appellant returned from his journey he was seen to have considerable money, the exact amount not being definitely shown, but for a negro of his antecedents a not inconsiderable sum. Prior to his leaving he was shown, by strong cir-

cumstantial evidence, not to have had any money, or in any event very little. On his return he had with him a considerable quantity of eggs and a few chickens. These he sold. The eggs he offered for sale as twenty dozen. The purchaser testified that he said to appellant that he thought there were more than twenty dozen eggs in the lot, and that he would count them and pay him for them at the rate of 20 cents a dozen. That he paid him $3 at the time for the eggs and that there was a balance due on the eggs which was yet unpaid. That when counted there was in the lot eighty dozen and one eggs. This witness also testified that at this time there was in the possession of appellant some oranges and at least $40 or $50 in money. A witness named Henderson who had seen appellant and Turner as they were journeying away from San Antonio, testified that he saw appellant about four miles from the city on Thursday morning. That he was at the time cutting wood, and appellant appeared alone, going in the direction of San Antonio when witness said to him: "Well, what did you do?" and that appellant replied: "We bought a good many chickens and the horse I have got wouldn't pull them and I am going to town for a double team and my partner is down there with the chickens."

Appellant introduced some testimony, not we think very conclusive of alibi, and to the effect, in substance, that he was in the City of San Antonio late Wednesday night and early on Thursday morning. This testimony was given by one R. C. Chisholm and his wife, Esther Chisholm. The reputation of Chisholm for truth and veracity was shown to be bad, and he was shown by the testimony to have at first said that appellant returned from the country on Thursday, April 25, 1908. In his own behalf appellant testified as follows: "The evidence of the witnesses in this case as to my movements and Turner's movements up to the time we left Lavernia on Wednesday evening is correct. Also the evidence of the witnesses as to the contract entered into between Turner and myself to go out into the country peddling. After we left Lavernia Turner met a Mexican on the road and went to one side to talk to him. After awhile Turner came to me and told me he had decided to continue his trip in company with the Mexican he had been talking to there. The road was muddy and my horse couldn't pull any more of a load. The Mexican had a team of gray horses and a black mule colt. Turner and I divided up our things. That was about five or six o'clock on Wednesday evening. Then I started on to town and after getting here I fed my horse and went to bed. Yes, I met Mr. Baker the next morning, and sold him some friers at 50 cents each and eggs at 10 cents a dozen. I did not know how many there were, but offered to let him have them as twenty dozen. He asked me if I was drunk and I told him I was not and he said, "Yes, you are, here take another drink," and handed me his flask and I took a drink. On the way out, Turner told me that he wanted $6 and if I would let him have it I could take his watch and bring it to town with me and pawn it for $6 and no more, and that he would take it out when he got back to town and not to get

any more on it. He said he had some money but might need some more. That's how I came to get the watch. When I was leaving him he handed me his gun and told me to take care of it because he had had it a long time. He said: "If I don't get back to town by Saturday you pawn the watch," and I said, "All right." On Tuesday evening we were driving along and it was cool and he and I laid our hats down on the seat or in front of us—no, I mean on Wednesday afternoon—it was not then sundown and when I unloaded Mr. Turner, he got off the wagon with what I thought was his hat in his hand, and afterwards I found out that the hats had been exchanged. I didn't know that though until after I was arrested. When I was at Duke's saloon on Saturday evening I had about 80 cents loose change, one $5 bill and two $1 bills. The bills I had received in this way: J. F. Baker gave me the $5 bill for eggs and friers and the others I had gotten peddling. We passed ten or twelve houses after leaving Lavernia when Turner left me." On cross-examination, appellant testified: "The witness McCauley did not tell the truth when he said that I told him that I only went as far as East Commerce street with Mr. Turner, and that Mr. Turner bought his own rig and paid me $1 for my services and that I came back. Yes, I heard his testimony and I did not tell him anything like that. He has nothing against me that I know of and I never did anything to McCauley. I did not see Ed Henderson on Thursday morning, neither did I pass his place at that time—I went by there on Wednesday night when they were all asleep. He did not talk to me or I to him. Yes, I heard his testimony and it is not true—it is absolutely false. Yes, in 1891 at LaGrange I was charged with murder. I do not know who the Mexican was Turner was speaking to, and I don't know where he lives, but I know where I saw him; it was on the Lavernia road and the Mexican was in the big road going to Lavernia. I don't know whether Turner had seen him before or not. We had three chicken coops and three cases of oranges and three parts of cases of eggs, and I turned his part over to him (Turner) on the side of the road. I don't know where the Mexican was when we divided up. Turner said he was going to get the Mexican's team. The Mexican didn't have a word to say to me. I left Turner alongside the road between 5 and 6 o'clock on Wednesday evening. No, sir, I was not at any fire when Ramzinsky passed along the road and I did not say to him, 'You are leading the poor boy' (referring to the dog). I heard his testimony and I never said any such thing and was not there and I was not there when Dick Ramzinsky passed there. I did not eat any supper on Wednesday night. I do not know whether the slicker you have here is the same one we had or not. I know he had a new one. No, I did not see the Mexican with a slicker like that. The slicker we had belonged to Mr. Turner, but I don't know whether that's the same slicker or not. No, sir, Turner and I did not stop and camp alongside the road on Wednesday evening, nor did I kill Thomas J. Turner there after nightfall or at all. I do not know who murdered him." We have not attempted to do more than

make a condensed statement of the more important and controlling facts shown by the State and on which a conviction was sought. On the facts in evidence the court gave a very fair and favorable charge to the jury of which, so far as the record shows, no complaint is made. The appellant was convicted of murder in the first degree and the death penalty was assessed against him by the jury. His motion for a new trial having been overruled in the court below he has appealed to this court and seeks a reversal of the judgment of conviction upon the following grounds, which are stated by his counsel:

"First. Because said verdict is contrary to law. Second. Because said verdict is contrary to the evidence. Third. Because the court erred in permitting the State to prove by defendant over the objection of the defendant that he had been indicted for murder some years ago. Fourth. Because the court erred in admitting the State over the objection of the defendant introduction of a picture of the deceased taken long before the death of the deceased. Fifth. Because the court erred in refusing to give the charge requested by the defendant."

1. The third and fourth grounds of the appellant's motion relate to matters occurring during the trial and complain of the admission of evidence against him. There is no bill of exceptions in the record as to these matters or either of them and under the uniform and unbroken decisions of this court we cannot review these assignments.

2. On the trial appellant requested the court to instruct the jury as follows: "You are instructed if you believe from the evidence that J. Williams alias Doc. Williams was in the City of San Antonio at 6:30 a. m. or 8 o'clock a. m. on the 23rd of April 1908, then the defendant could not have been at the place where the deceased was found, near or six miles from Lavernia, said to be twenty-five miles from San Antonio. You should acquit the defendant."

On this subject the court gave the following instruction in his general charge to the jury: "Among other defenses set up by the defendant is what is known in legal phraseology as an alibi; that is, that if the offense was committed, as alleged, then the defendant was, at the time of the commission therof, at another and different place from that where such offense was committed, and therefore was not and could not have been the person who committed the same. Now, if the evidence raises in your minds a reasonable doubt as to presence of the defendant at the place where the offense was committed at the time of the commission thereof, you will find the defendant 'Not guilty.'" The general charge was a clear, lucid and unexceptional submission of the issue of alibi. If the special charge had been in every respect unobjectionable, the court having given a sufficient charge on the subject, was not required to give same, and certainly the refusal to do so should not be held reversible error. However, we think the special charge not in correct form and that same was too restrictive.

3. The only question remaining to be considered is that the verdict of the jury and the judgment of the court are contrary to the evidence.

In what respect or for what reason or reasons the judgment of conviction is contrary to, or unsupported by the evidence, the motion does not in any manner point out, or suggest. We have, unaided by any brief or argument, on behalf of appellant carefully examined the entire record and given same the careful and deliberate consideration which the awful nature of the punishment assessed would, as an act of both duty and humanity, suggest and demand. The evidence is circumstantial, but assuming that the witnesses are credible (and they are in the main wholly disinterested), makes a case, which considered altogether, leaves in our minds no room for doubt that the appellant is guilty. So believing, it becomes our duty to affirm the judgment of the court below which is here done.

*Affirmed.*